**Kenneth T. BLAYLOCK, Petitioner,**

v.

**UNITED STATES MERIT SYSTEMS PROTECTION BOARD, Respondent.**

No. 87–7391.

United States Court of Appeals,
Eleventh Circuit.

Aug. 10, 1988.

Tjoflat errs by failing to recognize this and by failing to recognize the ramifications of *Lugar*.

\* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

Mark D. Roth, General Counsel, Washington, D.C., Stuart Kirsch, Fifth Dist. Counsel, College Park, Ga., Sandra Sue Adams–Choate, American Federation of Government Employees, Washington, D.C., for petitioner.

Robert E. Taylor, Clerk of the Bd., Merit Systems Protection Bd., Marsha Mouyal, Office of General Counsel, David C. Kane, Washington, D.C., for respondent.

Before KRAVITCH, Circuit Judge, HENDERSON\* and HENLEY\*\*, Senior Circuit Judges.

KRAVITCH, Circuit Judge:

Kenneth Blaylock petitions this court for review of a decision by the Merit Systems Protection Board (Board) finding him in violation of the Hatch Political Activities Act, 5 U.S.C. § 7324(a)(2) (Hatch Act). *See Special Counsel v. Biller*, 32 M.S.P.R. 110 (1987). We reverse.

\*\* Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

## I.

Kenneth Blaylock worked as a civilian employee of the Department of the Air Force from 1954 to 1972, when the Air Force granted him leave without pay to serve as President of Local 997 of the American Federation of Government Employees (AFGE). At no time thereafter has Blaylock occupied his original position or any other governmental position. Since 1972 he has worked for AFGE in a full-time capacity, and he served as National President of AFGE during the time of the events relevant to this case.

AFGE is the exclusive bargaining representative of approximately 700,000 federal employees. As National President of AFGE, Blaylock communicated to the membership through a column in the union's official publication, *The Government Standard*. AFGE circulates *The Government Standard* to approximately 200,000 active and retired federal employees.

AFGE's relationship with the administration of President Reagan has never been especially warm. AFGE has filed suit against the President and other officials several times; it opposed, for example, the administration's actions on pay schedules and seniority rights. AFGE also opposed, with particular vigor, the administration's attempts to reduce the number of federal employees.

From May 1983 to June 1984, Blaylock published in *The Government Standard* eight articles highly critical of President Reagan, Office of Personnel Management (OPM) Director Don Devine, and the Reagan administration's policies on a variety of subjects. These articles are reprinted in full as appendices A through H to this opinion. The first article accused the Reagan administration of "coldly selecting managerial people on the basis of their political ideology ... without regard to their executive ability." Blaylock urged the union to "reverse Reagan's headlong trend toward destruction" and insisted that "we must help get the Reagan Administration off the back of this government." A second article reminded readers that "[w]hen we go to the polls we are not only electing a President, we are electing our boss," emphasized the union's power in achieving results through political action, and urged AFGE members to take part in a process designed to determine whom AFGE would endorse in the 1984 presidential election. The third article criticized the administration's treatment of federal workers and stated, "We know it's politics that got federal workers into this adverse situation, and it will take a change in the political climate to end it." The fourth article described an AFL–CIO convention at which Walter Mondale had been endorsed as a preferred presidential candidate; Blaylock reported the AFL–CIO's decision that "[f]rom a field of several qualified contenders, Walter Mondale has emerged as the person we believe can best lead the country, its economy and its people forward on a fair and productive path." The fifth article responded to accusations by President Reagan and Senator Gary Hart that Walter Mondale was "in the pocket of special interest groups" by emphasizing the economic plight of young parents, small businessmen, the elderly, and the poor. The article also portrayed President Reagan as the "barker" in a "shell game" by which rich and powerful interests successfully diverted the country's attention from its real problems. The sixth article accused President Reagan of representing "the special interests of the rich, the Radical Right–Wing and the international corporate power brokers of the world" and expressed preference for a president who would represent "the interests of the old, the young, the poor, the workers, the minorities, the handicapped, and the unfortunate." The seventh article asserted that the administration's purported policy of improving government was actually designed "to cut pay and chop benefits to make civil service so unattractive that the better minds and more talented technicians [will] abandon[ ] the federal workforce in droves." The article concluded, "It's time [President Reagan] was challenged. I'm ready to take him on. Are you?" The eighth article attacked the new associate director of OPM for following an administration policy of ignoring the rights

of women and minorities, suggested that the President be given the "Bonzo Award nominee for his portrayal of a President heading an administration infamous for its double standard," and concluded with the exhortation, "That's why I say again and again, vote yourself and help get others out to vote. The voting booth is our only hope and the only uncorrupt place left in the Reagan Administration."

Under the Civil Service Reform Act of 1978, the Special Counsel of the Merit Systems Protection Board has authority to investigate violations of federal employment laws and practices, *see* 5 U.S.C. §§ 1206(a)(1), (a)(3), including violations of the Hatch Act, *see* 5 U.S.C. § 1206(e)(1)(A). If the Special Counsel determines that disciplinary action should be taken against an employee, the Special Counsel presents a written complaint to the Board. 5 U.S.C.

§ 1206(g)(1). The Merit Systems Protection Board then exercises its authority as an adjudicatory agency with jurisdiction over certain federal employment disputes. 5 U.S.C. § 1205(a)(1).

On February 26, 1985, the Special Counsel presented a complaint to the Board alleging that Blaylock had violated the Hatch Act, 5 U.S.C. § 7324(a)(2),[1] and its implementing regulations, 5 C.F.R. §§ 733.122(b)(7), (b)(10),[2] by the publication of the above-mentioned eight articles in *The Government Standard.* Blaylock's answer to the complaint asserted (a) that his actions were not prohibited by the Hatch Act, (b) that his actions were expressly permitted by the Hatch Act and its implementing regulations,[3] (c) that he was not an "employee" within the coverage of the Hatch Act,[4] (d) that his actions were pro-

---

1. The relevant sections of the Hatch Act provide as follows:

 5 U.S.C. § 7324(a). An employee in an Executive agency or an individual employed by the government of the District of Columbia may not—

 (2) take an active part in political management or in political campaigns.

 For the purpose of this subsection, the phrase "an active part in political management or in political campaigns" means those acts of political management or political campaigning which were prohibited on the part of employees in the competitive service before July 19, 1940, by determinations of the Civil Service Commission under the rules prescribed by the President.

 (b) An employee or individual to whom subsection (a) of this section applies retains the right to vote as he chooses and to express his opinion on political subjects and candidates.

2. The relevant regulations provide as follows:

 5 C.F.R. § 733.122(a) An employee may not take an active part in political management or in a political campaign, except as permitted by this subpart.

 (b) Activities prohibited by paragraph (a) of this section include but are not limited to—

 ....

 (7) Soliciting votes in support of or in opposition to a candidate for public office in a partisan election or a candidate for political party office;

 ....

 (10) Endorsing or opposing a candidate for public office in a partisan election or a candidate for political party office in a political advertisement, a broadcast, campaign, literature, or similar material[.]

3. The Hatch Act expressly states that "[a]n employee or individual to whom [5 U.S.C. § 7324(a) ] applies retains the right to vote as he chooses and to express his opinion on political subjects and candidates." 5 U.S.C. § 7324(b). Implementing regulations, 5 C.F.R. § 733.111(a), further state that "[a]ll employees are free to engage in political activity to the widest extent consistent with the restrictions imposed by law and this subpart. Each employee retains the right to ... (2) [e]xpress his opinion as an individual privately and publicly on political subjects and candidates."

4. The Hatch Act applies only to an "employee in an Executive Agency." 5 U.S.C. § 7324(a)(2). The term "employee" is defined at 5 U.S.C. § 2105 as an officer and an individual who is (1) appointed in the civil service by certain other federal officials; (2) engaged in the performance of a Federal function under authority of law or an Executive act; and (3) subject to the supervision of certain federal officials. Blaylock argues that he was neither engaged in the performance of a Federal function nor subject to supervision of federal officials at the time that he published the eight articles in. *The Government Standard* because he was on unpaid leave from his duties with the Air Force. The government argues that unpaid leave status does not relieve a federal employee from the strictures of the Hatch Act. Because we conclude that Blaylock's actions were not prohibited by the Hatch Act and reverse the decision of the Board on that ground, we do not reach the issue of whether Blaylock was an "employee" within the meaning of the Hatch Act. We also do not reach the issue of whether Blaylock's actions were privileged under principles of labor law.

tected under principles of labor law as "criticism of the boss," and (e) that application of the Hatch Act prohibitions to him would be unconstitutional. Recognizing the far-reaching implications of these assertions, the Special Counsel moved for hearing before the Board itself rather than before an administrative law judge. The Board denied this motion and assigned the case to an ALJ. The ALJ rejected all of Blaylock's arguments and recommended that Blaylock be suspended for sixty days. The Board adopted the ALJ's recommendation.

## II.

### A.

For almost forty years the Hatch Act has imposed significant restrictions on political activity by employees serving in the executive branch of the federal government. The cornerstone of the Hatch Act is 5 U.S.C. § 7324(a)(2), which forbids such employees to "take an active part in political management or in political campaigns." Implementing regulations have supplied examples of the prohibited activities. An employee may not, for example, serve as an officer of a political party, solicit funds for a political party, run for office in a partisan election, act as a "poll watcher" in a partisan election, drive voters to the polls "on behalf of a political party," or serve as a delegate to a party convention. *See* 5 C.F. R. § 733.122.

Although the restrictions imposed by the Hatch Act are substantial, Congress did not enact the Hatch Act with indifference to the first amendment rights of federal employees. Congress restricted the scope of the Hatch Act with three important provisions.

First, Congress expressly preserved the right of federal employees to express their own political opinions both privately and publicly. Before the enactment of the Hatch Act, the Civil Service Commission's Rule I prohibited persons in the classified civil service from taking an active part in political campaigns but also recognized those employees' right "to express private-

ly their opinions on all political subjects." *See United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 559, 93 S.Ct. 2880, 2887, 37 L.Ed.2d 796 (1973). Opponents of the Hatch Act in the House of Representatives expressed concern that limiting federal employees' freedom of speech to merely private expressions of political opinions would be unconstitutional. *See* 84 Cong. Rec. 9601, 9602, 9614, 9622–9623 (1939). The final version of the Hatch Act differed from Civil Service Rule I by omitting the word "privately" and recognizing the privilege of employees "to express their opinions on all political subjects." The regulations follow the statute in this regard and recognize the right of each federal employee to "[e]xpress his opinion as an individual *privately and publicly* on political subjects and candidates." 5 C.F.R. § 733.111(a)(2) (emphasis added). Second, when Congress amended the Hatch Act in 1940, it extended the Act's protection of private and public expressions of political opinion to include expressions of opinion about *candidates. Letter Carriers,* 413 U.S. at 562, 93 S.Ct. at 2888–89. Section 7324(b) thus reads, "An employee ... retains the right to vote as he chooses and to express his opinion on political subjects *and candidates* " (emphasis added).

Third, the 1940 amendments limited the authority of the Civil Service Commission (the predecessor of the Merit Systems Protection Board) to interpret and define the prohibited political activities. The Senate committee considering amendments to the Act originally recommended that the Civil Service Commission be authorized to promulgate rules and regulations defining the term "active part in political management or in political campaigns." *Letter Carriers,* 413 U.S. at 570 & n. 16, 93 S.Ct. at 2893 & n. 16. This proposal met resistance from members of Congress fearing a broad delegation to an administrative agency in such a delicate area. Senator Hatch then proposed, and Congress adopted, a substitute limiting the reach of the statutory prohibition to those activities that the Civil Service Commission had already determined to be prohibited. Hence, Con-

gress prevented the Civil Service from "fashioning a more expansive definition of the kind of conduct that would violate the prohibition," *id.* at 571, 93 S.Ct. at 2893, and from extending the prohibitions of the Hatch Act beyond the prevailing prohibitions of Civil Service Rule I. *Id.* at 573–74, 93 S.Ct. at 2895; *see American Postal Workers Union v. United States Postal Service,* 764 F.2d 858, 864 n. 29 (D.C.Cir. 1985), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 792, 88 L.Ed.2d 770 (1986).

### B.

The Hatch Act and its regulations thus create a web of prohibited and protected activities. One may concede that the web is not entirely seamless, and that there are difficulties both in ascertaining the precise extent of the prohibited and protected activities and in reconciling the scope of those activities.[5] Nonetheless, the fabric of the Hatch Act has a definite pattern that may be discerned. The pattern becomes clear upon close examination of the few judicial decisions that have addressed the Act and upon consideration of underlying first amendment principles governing public employment.

The Hatch Act first survived constitutional challenge in *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). That case was a declaratory judgment action brought by George Poole, a federal employee who had violated the Act by serving as a "ward executive committeeman of a political party and [being] politically active on election day as a worker at the polls and a paymaster for the services of other party workers." *Id.* at 94, 67 S.Ct. at 567. In rejecting Poole's assault on the Act, the Supreme Court stressed the importance of efficiency in governmental operations and the concomitant dangers that would be created if ad-

vancement in the public service were tied to partisan political activity. The Hatch Act guarded against the possibility that government employees would be used by superior officers to build a political machine. *Id.* at 101, 67 S.Ct. at 570.

The Court emphasized that Congress had limited the Hatch Act's prohibitions to the particular evil that the Act was designed to prevent: the influence of *partisan* politics on government activity. "Congress may reasonably desire to limit party activity of federal employees so as to avoid a tendency toward a one-party system." *Id.* at 100, 67 S.Ct. at 569. The Court pointed out that the Hatch Act leaves "untouched full participation by employees in political decisions at the ballot box and forbids only the partisan activity of federal personnel deemed offensive to efficiency. With that limitation only, employees may make their contributions to public affairs or protect their own interests, as before the passage of the act." *Id.* at 99, 67 S.Ct. at 569. "It is only partisan political activity that is interdicted. It is active participation in political management and political campaigns. Expressions, public or private, on public affairs, personalities and matters of public interest, not an objective of party action, are unrestricted by law so long as the Government employee does not direct his activities toward party success." *Id.* at 100, 67 S.Ct. at 570.

Under this interpretation by the *United Public Workers* Court, the Hatch Act was intended to prevent the entanglement of government employment with political parties. The Hatch Act stops party bosses from using government employees to establish their party irremovably in power. The Act also hinders executive branch officials from offering government employment as a reward for politically faithful but inefficient party workers.

---

**5.** Indeed, in the *Letter Carriers* case, 413 U.S. at 579, 93 S.Ct. at 2897, the Supreme Court noted the possible difficulties in deciding the precise issue confronting us today: "Arguably, there are problems in meshing § 733.111(a)(2) [permitting the expression of an opinion both privately and publicly on political subjects and candidates] with § 733.122(a)(10) [prohibiting en-

dorsement of a partisan candidate for public office]." The Court's conclusion that the prohibitory sections "carve[d] out [with sufficient clarity] the prohibited political conduct from the expressive activity permitted" was bolstered by its understanding that the proscribed acts were "partisan." *Letter Carriers,* 413 U.S. at 579, 93 S.Ct. at 2897.

The Hatch Act's focus on partisan political activity became yet more clear when the Supreme Court rejected the second major constitutional assault on the Act in *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). *Letter Carriers* presented a challenge to the Act brought by federal employees who wished to serve as political party officials and to run for elective office as partisan candidates. *See id.* at 551 n. 3, 93 S.Ct. at 2883 n. 3. The plaintiffs attacked the statute and its implementing regulations as overbroad and void for vagueness.

In turning aside this challenge, the Supreme Court stressed on almost every page of the *Letter Carriers* opinion that the central purpose of the Hatch Act was to prevent the corruption of federal employment by political party activity. "[I]t is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service, and that the political influence of federal employees on others and on the electoral process should be limited." 413 U.S. at 557, 93 S.Ct. at 2886. "Until now, the judgment of Congress, the Executive, and the country appears to have been that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences." *Id.* at 564, 93 S.Ct. at 2890. "It seems fundamental in the first place that employees in the Executive Branch of the Government, or those working for any of its agencies, should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party. They are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group of the members thereof. A major thesis of the Hatch Act is that to serve this great end of government—the impartial execution of the laws—it is essential that federal employees, for example, not take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns, and not run for office on partisan political tickets." *Id.* at 564–65, 93 S.Ct. at 2890. " '[T]he prohibitions against active participation in partisan political management and partisan political campaigns constitute the most significant safeguards against coercion [of federal employees].' " *Id.* at 566–67, 93 S.Ct. at 2891 (citation omitted).

The *Letter Carriers* Court conceded that interpretations might differ about whether some activities lay just inside, or just outside, the class of activities constituting "an active part in political management or in political campaigns." The Court expressed confidence, however, that most of the precise activities covered by this term could be prohibited constitutionally. The Court's list of the activities included in the statutory language is revealing. Congress unquestionably had the power to prevent federal employees "from holding a party office, working at the polls, and acting as party paymaster for other party workers." *Id.* at 556, 93 S.Ct. at 2886. Congress also could forbid federal employees from "organizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; becoming a partisan candidate for, or campaigning for, an elective public office; actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention." *Id.*

When the Court considered the statute in connection with regulations promulgated by the Civil Service Commission, it reaffirmed its conclusion that the Act was primarily concerned with partisan political activity. For example, the Commission's regulations prohibited endorsing or opposing partisan candidates, 5 C.F.R. §§ 733.-122(a)(10), and addressing political party conventions, 5 C.F.R. § 733.122(a)(12). The Court rejected the plaintiffs' contentions

that these regulations might chill the speech of federal employees, because "these restrictions are clearly stated, *they are political acts normally performed only in the context of partisan campaigns by one taking an active role in them,* and they are sustainable for the same reasons that the other acts of political campaigning are constitutionally proscribable." *Id.* at 580, 93 S.Ct. at 2898 (emphasis added).

### C.

■ These two Supreme Court decisions suffice to convince us that the statutory prohibition against taking an "active part in political management or in political campaigns" encompasses only active participation in, on behalf of, or in connection with, the organized efforts of political parties or partisan committees, clubs, and candidates.[6] *Accord American Postal Workers Union v. United States Postal Service,* 764 F.2d at 863 (holding that Postal Service may permit only nonpartisan organizations to conduct voter registration drives in postal facilities, but expressing doubts as to whether Postal Service could, consistently with Hatch Act, prohibit postal employees from participating in nonpartisan voter registration activity). An earlier decision by the Merit Systems Protection Board adopted this position as well. In *Special Counsel v. Biggs,* 16 M.S.P.R. 355 (1983), the Board dismissed a complaint alleging that a federal employee's purchase of a newspaper advertisement expressing the employee's negative opinion about a partisan candidate's position on environmental issues violated the Hatch Act. The Board followed the approach taken by the district court in *Wilson v. United States Civil Service Commission,* 136 F.Supp. 104 (D.D.C.1955), that a violation of the Hatch Act cannot be established absent evidence that a federal employee "acted in concert with any political party or movement; that he campaigned for any political party; or that his action was organized actively for

or against a political party." *Biggs,* 16 M.S.P.B. at 358 (quoting *Wilson,* 136 F.Supp. at 106).

The Hatch Act's implementing regulations, which give more detailed interpretation of the permitted and prohibited activities, also support our conclusion. The regulations permit essentially two types of political activity: *individual* expressions of political opinion, and *nonpartisan* political activity. *See* 5 C.F.R. § 733.111(a). The regulations permit an individual to vote, express an opinion about candidates, wear a political button, become a member of a political party, attend a political party convention, and sign a political petition. The regulations also permit much more "organized" political activity as long as that activity is nonpartisan. For example, a federal employee may take an active part, and indeed may run as a candidate, in a nonpartisan election. Employees may also participate in a variety of organizations such as "civic, community, social, labor, or professional organization[s]," which conceivably could express views on political issues.

■ Employing this interpretation of the Hatch Act we conclude that Blaylock's activities did not violate the Act. As the ALJ stated, "There has been no actual showing that these respondents acted 'in concert' with any political party."

### III.

### A.

In arguing that Blaylock's actions violated the Hatch Act, the government advances a very different construction of the Act. The government argues that Blaylock's columns were a "political campaign" within the meaning of section 7324(a)(2) because they constituted a sustained effort to persuade union members to vote against President Reagan. The government insists that Blaylock's columns were not "isolated" events of political expression, as were the letter to the editor in *Wilson* and the paid political advertisement in *Biggs.*

---

**6.** We do not rule out the possibility that expressions of opinion that, on their face, appear to be political statements of individuals, in fact may be made in connection with political parties by secret arrangement.

It is true that the word "campaign" can be understood as merely a series of attempts devoted to the same goal, "a connected series of determined operations or systematic efforts designed to bring about a particular result." *Webster's Third New International Dictionary* 322 (1986). This is not the only common understanding of the word "campaign," however, particularly when that word is preceded by the adjective "political." It is far more probable that Congress intended the statutory term "political campaigns" to refer to the formal efforts of organized political parties to secure the election of their candidates. This seems particularly likely in view of the "card" which Senator Hatch prepared with the assistance of the Civil Service Commission and inserted into the Congressional Record. *See Letter Carriers*, 413 U.S. at 572 n. 18, 93 S.Ct. at 2894 n. 18. This "card" summarized the activities that the Civil Service Commission believed to be prohibited under Rule I. The thrust of most of the activities is plainly partisan. For example, the card stated that employees could not serve "for or on any political committee," "solicit votes; mark ballots for others; help to get out votes; act as checkers, marker, or challenger for any party or engage in other activities at the poles [*sic*] except the casting of his own ballot," become officers of a political club, or distribute campaign literature.

Some of the activities listed on the card were not necessarily partisan in nature, but those activities are probably no longer illegal given the Hatch Act's express protections for public expressions of political opinions and for expressions of opinions about candidates. For example, the Civil Service prohibited employees from making "political speeches," but it is doubtful whether this prohibition survives the enactment of the Hatch Act in full force.[7] The Civil Service also forbade employees from "becoming prominently identified with ... the success or failure of [sic] supporting any candidate for public office," but this injunction was superseded by the Hatch Act's express privilege for stating views in support of, or opposition to, political candidates.

Indeed, the government largely overlooks the fact that 5 U.S.C. § 7324(b) and 5 C.F.R. § 733.111(a)(2) expressly preserve the rights of federal employees to express their opinions on political subjects and candidates. Under the government's construction of the statute, an employee would violate the Hatch Act simply by exercising his expressly preserved rights a sufficiently large number of times. A employee might be found to have played an active part in a "political campaign" if, for example, he told a coworker ten times that he opposed the reelection of President Reagan.

We do not believe this to be the intended result of the statute and regulations. Those provisions do not state that a federal employee has the right to express his political opinions only on "isolated occasions." Nor does the government suggest a method by which the Board, or the courts, could distinguish permissible isolated expressions of personal political opinion from more sustained "political campaigns."[8] Given the posture of this case, the government apparently believes that eight expressions of an individual's political opinion constitute a campaign; the magic number, however,

---

**7.** This entry in the "card" probably refers to paragraph 19 of the Civil Service Commission's Form 1236, which Senator Hatch inserted into the Congressional Record and which the Supreme Court reprinted as an appendix to its opinion in the *Letter Carriers* case. Paragraph 19, entitled "Expression of opinions," stated that employees in the competitive classified service must confine themselves to private expressions of opinion. *See Letter Carriers*, 413 U.S. at 585, 93 S.Ct. at 2900. This, of course, is no longer the law, as the Hatch Act permits federal employees to express their opinions on political subjects publicly. Paragraph 19 further stated that "[n]onclassified and excepted employees

may not indulge in such public expression of opinion as constitutes taking part in an *organized political campaign*," *id.* (emphasis added), a term that we do not believe can be stretched to include Blaylock's series of articles.

**8.** At oral argument, we asked counsel for the government where we could draw the line between permissible, isolated expressions of opinion and prohibited political campaigning if we adopted the government's construction of the Hatch Act. Counsel's reply was revealing: "Where that exact point is, I don't know."

might well be two, or five hundred. The government's construction of the Hatch Act would introduce into the Hatch Act the very void-for-vagueness problems that the *Letter Carriers* Court found absent by virtue of the Hatch Act's secure tie to partisan political activity. "Statutes regulating expression of opinion require delicate application and sensitive discrimination." *Wilson*, 136 F.Supp. at 106.

### B.

We also have difficulty in squaring the Board's conclusion that Blaylock violated the Hatch Act with the plain language of the implementing regulations. 5 C.F.R. § 733.122(10) prohibits "[e]ndorsing or opposing a candidate for public office in a partisan election or a candidate for political party office *in a political advertisement, a broadcast, campaign, literature, or similar material.*" The placement of the comma between the words "campaign" and "literature" is undoubtedly a typographical error. The regulation appears without the comma in both the *Federal Register, see* 35 Fed.Reg. 16,785 (1970), and the *Letter Carriers* opinion where the Supreme Court passed on the constitutionality of the implementing regulations. *See* 413 U.S. at 576 n. 21, 93 S.Ct. at 2896 n. 21. With the comma, the regulation either makes little sense or seems dangerously broad. We doubt that the Civil Service Commission, which promulgated the regulations, intended to prohibit federal employees from opposing candidates for public office in all "literature." Without the comma, the regulation simply prohibits candidate endorsements in certain kinds of media commonly associated with formal, organized efforts to secure a candidate's election in a partisan race. The record copies of *The Government Standard,* in which Blaylock's columns appeared, are not political advertisements, broadcasts, campaign literature, or similar material. *The Government Standard* is a regularly published newsletter distributed to the members of a large union.

We are left, then, with the possibility that Blaylock's columns constituted "soliciting votes in support of or in opposition to a candidate for public office in a partisan election," in violation of 5 C.F.R. § 733.122(7). The government urges us to conclude that Blaylock solicited votes because he publicly opposed the reelection of President Reagan and supported the candidacy of Walter Mondale. In the first place, our conclusion that the Hatch Act is violated only by actions taken in concerted effort with partisan activity or formal, organized, political groups prevents us from accepting the government's argument as to the regulations, which go no further than the statute in prohibiting political activity.

Second, even without the Act's emphasis on partisan political activity, we could not conclude that Blaylock "solicited votes." Only six statements on the record could possibly be characterized as "soliciting votes" for Mondale: "[W]e must get Ronald Reagan out of the White House"; "You must use the power of your input"; "Walter Mondale has emerged as the person we believe can best lead the country"; "Our votes will elect a President who's [sic] special interest is all Americans"; "I'm ready to take [President Reagan] on. Are you?"; and "That's why I say again and again, vote yourself and help get others out to vote." Several of these statements refer only to voting generally or express only general opposition to President Reagan; they do not even connect the President with the election. Congress and the Civil Service Commission did not intend the Hatch Act to silence all criticism by federal employees of an incumbent President seeking reelection.

Even if the last statement—made in June 1984, five months before the general election between President Reagan and Walter Mondale, and before Mondale had even been nominated as the Democratic candidate—could be read as a direct encouragement to vote for Mondale, that does not necessarily mean that the statement "solicited votes." Expressing opposition to one candidate and support for another is not necessarily "soliciting votes." On the contrary, the Hatch Act explicitly preserves an employee's right "to express his opinion on political subjects *and candidates.*" 5 U.S.

C. § 7324(b) (emphasis added). We must give effect to the statute's permissive parts as well as to the prohibitory regulations.

The government apparently would have us hold that a federal employee's right to express an opinion about a candidate does not include the right to urge another voter to follow that expressed opinion. In the government's view, federal employees may speak and write, "I support Mondale" or "I oppose Reagan" but may not utter, "I urge you to vote for Mondale and against Reagan." We cannot believe that Congress or the Civil Service Commission intended to draw this fine a line. If construed in this manner, the regulations would lack certainty of meaning and predictability of enforcement. Moreover, this construction clearly does not govern other activities under the Hatch Act. The regulations permit federal employees to wear political buttons, 5 C.F.R. § 733.111(a)(3), which by their very nature urge others to vote for or against particular partisan candidates. Whatever is the meaning of "soliciting votes," that term refers to a far more organized and formal effort than Blaylock's articles.

## IV.

Because we conclude that the Hatch Act did not prohibit the publication of Blaylock's eight articles in *The Government Standard,* we do not reach the merits of Blaylock's constitutional challenge. We note, however, that the application of the Hatch Act to Blaylock's activities, which were not undertaken in connection with any organized partisan campaign, implicates the most delicate questions involving the first amendment. Moreover, the government's attempt to defend its personnel action against Blaylock under the justification of government efficiency, when the record indicates that Blaylock had been on unpaid leave for over a decade and held no government position when these articles were published, suggests grave constitutional difficulties. "This Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.... Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). "[A] careful study of the statute may either eliminate, or narrowly limit, the constitutional question that we must confront." *Lowe v. SEC,* 472 U.S. 181, 190, 105 S.Ct. 2557, 2563, 86 L.Ed.2d 130 (1985). In this case, as in *Lowe,* a careful study of the statute has eliminated the constitutional question entirely.

Accordingly, the decision of the Merit Systems Protection Board is REVERSED.

HENLEY, Senior Circuit Judge, concurs in the result only.

## APPENDIX A

**Opinion**

**Like it or not, government is undergoing a revolution**

Don't kid yourself. We are in the middle of a revolution as far as this government is concerned. Like the Bastille in the French Revolution, the merit system fortress is being toppled, and a "spoils" system is being swiftly erected to replace it, regardless of the Pendleton Act, or any number of laws the Reagan Administration cooly ignores.

The Reagan Administration, in agency after agency, is coldly selecting managerial people on the basis of their political ideology—Reagan Right Wing ideology, that is—without regard to their executive ability, or their understanding of government's role or purpose.

In fact, in some agencies, such as EPA, Interior, Justice and Transportation, Reagan has installed his loyalists who deliberately pervert the statutory mission of the agency: EPA puts roadblocks in front of pollution control, Interior peddles federal lands and resources to their profit-hungry friends, Justice finds reasons not to en-

force civil rights and Transportation sabotages car and airline safety.

Look back in history, and you'll recall the Pendleton Act established the merit system for two reasons—to reserve [sic] continuity of government service, and to create a stable year-in, year-out government workforce impervious to two-year or four-year partisan political elections. The Act was to bury the "spoils" system. Reagan has resurrected it.

There was another revolution, too, that climaxed with Reagan's election. Before him, politicians campaigned by promising to make government "more efficient"—that is, to keep it but to make it better.

Reagan said he intended to get government "off our backs" (substitute "corporations" for "our")—that is, to destroy it. And with the bull-in-a-china-shop of his appointed Right Wingers like OPM's Donald Devine, he is plowing ahead doing just that.

As a result, our government has lost that year-in, year-out stability that was its hallmark—not just for us, its workers, but at the policy level, too.

Other nations, who once thought they understood the fundamental policies of the U.S. government, and could work with it to preserve peace and worldwide economic prosperity, are just as bewildered as we in the federal workforce are about management policies and intentions.

We are faced, therefore, with more than just preserving our livelihoods. We must, as a responsible union, do everything within our power to preserve this government and restore it as the hope of the world, capable of serving the American people, as well as being a model workplace.

To do that, we must reverse Reagan's headlong trend toward destruction. Just as he "got government off the backs" of the corporations, we must help get the Reagan Administration off the back of this government.

To do that, those who have held back must be persuaded to join our effort. We must organize workers. We must push our political action program through to completion.

The presidential endorsement process described elsewhere in these pages is another step toward that, to go along with education of our members on the issues, voter registration, the raising of AFGE–PAC funds getting out the vote for the 1984 elections.

If that seems like a long, tough task, remember: In order to get Don Devine off our backs, we must get Ronald Reagan out of the White House.

Director Devine says that I stand alone in opposition to OPM's programs, and that the majority of federal workers support his actions. I WOULD LIKE TO KNOW WHERE YOU STAND. LET ME HEAR FROM YOU.

I hope that letters from our members flood the National Office, confirming my faith in our members and their desire to work for decent pay, with justice and dignity, for a government that with merit truly serves our nation, not just the Fortune 500 and the Right Wing spoils system.

Kenneth T. Blaylock
National President

APPENDIX B

**AFGE Presidential Preference Poll**

Our current boss has forced us to learn some very important and difficult lessons over the past couple of years. With each attack from the administration, AFGE rose to the challenge and utilized its political action campaign.

When the boss made a commitment to transfer more and more of our jobs to big business, we went to Capitol Hill to urge our elected representatives to act. We won a moratorium and we learned how to fight contracting-out.

When the boss said it was time for us to be part of the Social Security system, you came to Washington in droves to lobby your Representatives and Senators. We were not totally victorious, but we did protect retirement benefits for all current

workers through the power of mass lobbying.

Most recently phone calls, letters, and other political activities by you convinced Congress to block OPM from implementing its unfair performance evaluation system that would subject all workers to favoritism.

Essentially, we've learned that when we —as a union—realize our strength, organize our resources, educate ourselves, and communicate with one another, we can develop the capabilities and conviction to speak with one loud, clear voice that cannot be ignored.

With these lessons learned, AFGE now stands ready to put its newly-developed knowledge and power to the real test: Let's implement a performance appraisal system for our boss. That is what this issue of THE GOVERNMENT STANDARD is all about.

You have read about the 1984 presidential election issues in this publication over the past few months. You have probably seen the video tape of the announced contenders. If not, ask your local steward or officers to acquire it for you.

You have heard the candidates address the priorities of federal workers, and you know where they stand on the major issues confronting all Americans.

It is critical that you know how the political process works, where your union fits into it, and that you participate.

After thoughtful review of all this information I hope that you have reached some conclusion about which candidate is the best equipped, fair-minded and most capable to lead our country and our government.

It is time for our union to speak, and to speak clearly. As your president, I need your help and guidance. I need you to complete the ballot inside and return it to National Headquarters so that AFGE can produce a clear and unified consensus on which presidential candidate can best serve the needs of government workers and our country.

With that consensus guiding us, AFGE and organized labor can begin to work in an effective way to elect that candidate as president of the United States.

When I inform the AFL–CIO, the news media, or anyone else of this union's presidential preference, they will know that I speak unequivocally for AFGE members and federal workers across the country. A united voice cannot be ignored.

I urge you to not underestimate our role and our voice in this presidential endorsement process. Remember, your employer —the federal government—is involved in every aspect of American life.

That places us in one of the most unique and high-stake positions of all voters. When we go to the polls we are not only electing a President, we are electing our boss.

If we take that responsibility seriously, there is much we can accomplish through grass roots political action and participation. That responsibility can be either perilous or powerful, and the choice is ours.

Let's put our political knowledge and action to the test. If you want people like OPM Director Devine to continue treating government workers like second class citizens, then you should remain silent.

But if you believe that this country needs to elect a President who truly understands the problems facing this country, then you must use the power of your input.

Additionally, if this country is to elect a President who treats government employees with fairness and respect, you will immediately complete this ballot and return it to AFGE so that with one loud, lucid, collective voice, your union can stand up and be counted.

Kenneth T. Blaylock
National President

APPENDIX C

**Opinion**

**There's a change sweeping through our political thinking**

There's a new attitude within our ranks ... a new feeling about what we as a union are capable of and what we can accomplish.

## Political action results

Last month, as part of our presidential endorsement process, I talked to you about the tangible results of our political action program. What I want to talk to you about now is not as easy to define or list. There is no scoreboard or measurement standard.

It is an attitude. It is a feeling that we have about our union and ourselves, collectively and individually.

We never expected someone like Don Devine to come along and gut the programs we worked on and the benefits we worked for. We never expected a President of the United States to declare war on his own workforce.

But, to our surprise, it happened. AFGE members in particular, and federal workers in general, have been shaken from complacency. We have been forced to readjust our priorities and discover new ways to fight our battles through political action.

### Members truly concerned

As I travel around this country to visit locals I see people truly concerned about what's happening. AFGE members are relating the individual problems at their worksites to the overall political situation in this country.

We know that it's politics that got federal workers into this adverse situation, and it will take a change in the political climate to end it.

Most importantly we are all aware that we have a role to play in changing it. We no longer expect "someone else" to do the job for us or make things right for us.

We are aware that if we don't like the direction in which Don Devine is leading government personnel policies and if we don't like the way the Reagan Administration is forcing middle class Americans to shoulder the tax burden, it's up to us to change it.

### We can make it real

The new attitude is not the change itself, it is the awareness that we can make it a reality.

Not too long ago, the most frequent questions I received in the field were "What is the union doing about my problem?" "What is the union doing for me?"

Now I hear something entirely different. The questions are indicative of a new attitude of awareness. "What can WE do to stop our jobs from being contracted out?" "What can WE do to stop the Reagan Administration's attack on federal workers?" "What can WE do to stop Don Devine from placing us under the spoils system?"

With the new ways we are using to deal with our problems, WE can do it. WE are doing it. WE are the union.

### Evidence everywhere

During my recent trip to San Francisco, I observed AFGE members successfully focusing public attention on the problems of asbestos in federal buildings.

In Harrisburg, I saw our people mounting a well-structured organizing drive around the issues vital to the federal workforce.

### Working with others

In Cincinnati, I participated in a news conference arranged by AFGE members to detail the disastrous impact OPM's proposed regulations will have on workers and the community.

In Danville, IL, AFGE members are working with senior citizens, community and labor groups to fight Reagan Administration policies.

All across the country AFGE members came out in droves to rally around the principles of organized labor on Solidarity Day III.

In cities and towns across the nation, AFGE members are gearing up for voter registration drives and other activities that will focus the public spotlight on issues vital to public employees and other working Americans.

### It's loud and clear

The message is coming in loud and clear from every member and every local I have visited recently. There is a new positive attitude about our purpose and an aware-

ness about our strength. AFGE has moved away from the frustration of complacency and toward the power of unity.

Now that we have realized the power of unified action, we can use the power of our numbers to attack common problems. There is no doubt in my mind that we will be successful.

Kenneth T. Blaylock
National President

## APPENDIX D

**With endorsement, we take initiative to direct our future**

The American labor movement has again emerged as the proud and powerful leading force in a new era of political action.

That is the obvious and unmistakable result of the AFL–CIO Convention I attended earlier this month. I was moved by our unity and convinced by our commitment that we are on the right road toward reversing Reagan Administration policies that have placed every economic and social burden on the backs of American workers and their families.

The AFL–CIO endorsement of a presidential candidate in advance of the primary elections is one of the most significant accomplishments of our time. In the emphatic words of Lane Kirkland, WE WILL NO LONGER "SIT MEEKLY ON THE SIDELINES WHILE OTHER ELEMENTS OF OUR SOCIETY ... LESS DEDICATED TO THE GENERAL GOOD, DEFINE THE CHOICES OF CANDIDATES AND ISSUES."

We have taken the initiative to direct the future of this country. Every union asked its membership to tell its leaders what the priorities are. Then, through an extensive process, we arrived at a clear and unified conclusion. The result was more than obvious at the AFL–CIO Convention as labor union members spoke with one voice that will grow louder and louder as the 1984 Presidential election nears.

From a field of several qualified candidates, Walter Mondale has emerged as the person we believe can best lead the country, its economy and its people on a fair and productive path.

The most important thing to understand is that WE HAVE NOT ONLY REACHED A CONSENSUS ON A CANDIDATE BUT, MORE CRUCIAL TO US, WE HAVE REACHED A UNIFIED CONSENSUS ON A CAUSE, A COMMITMENT AND A DIRECTION FOR THE FUTURE OF AMERICA.

The American Labor movement has come full cycle. Labor has not played such a key role in obtaining and preserving the rights of American workers since the 1930's when collective bargaining rights were achieved through the National Labor Relations Act.

It was also during the tumultuous 1930's that the foundation for unemployment insurance was established through the passage of the Social Security Act, and the Fair Labor Standards Act set minimum wage, maximum hours, equal pay regulations and child labor standards.

At that point in time federal workers did not get involved in the struggle because of the seemingly safe and secure Civil Service system given to us by Big Brother.

And so different goals require different directions. The gains of political action in the 1930's provided the vehicle for pursuing the concerns of workers in the decades that followed.

As federal workers, we relied upon the Civil Service system to work out our problems and our brothers and sisters in the private sector depended upon their ability to bargain with each employer or industry.

Now in 1983, we see the intent and purpose of our legal rights, won through the collective political conviction and sweat of those before us, subverted by the antiworker, pro-rich policies of the Reagan Administration and its right-wing companions.

The Reagan Administration is destroying the basic principles that made the pursuit of fairness and equity in the workplace a national policy. It is clear that the situation confronting us today requires the same unity and sense of commitment that was so evident some 50 years ago.

With revitalized unity and conviction, all American workers must join together in political action to return to the principles we believe in to their rightful place in the policy of this nation.

The AFL–CIO endorsement provides us with the vehicle to make that goal a powerful reality.

The timing, unity, and force behind the endorsement of Walter Mondale means American workers will not be lost in the shuffle of campaign promises and so-called priorities "LESS DEDICATED TO THE GENERAL GOOD."

I am convinced that government workers have a vital role to play in this process. This time, unlike the 1930's, we will be part of the moving force. We will accept the challenge and we will reap the benefits of political action.

In this political process, we have more at stake than any other group of workers.

Federal workers will not have pay equity, proper fringe benefits, and a safe work-site free of discrimination until we have collective bargaining and until we have the same legal protection afforded any other work force in the country.

Kenneth T. Blaylock
National President

### APPENDIX E

**Opinion**

**Who's in whose pocket?**

President Reagan and Democratic candidate Senator Gary Hart are getting a lot of press coverage by claiming Walter Mondale is "in the pocket of special interest groups."

But who is in whose pocket is not really the question, or ought not be. The real question is: Whose pocket is full and whose is empty? To understand that, and then to get the answer, you might well ask yourself: "What shape is my pocket in?"

Look around you. In what shape are the pockets of the workers in your community? How fat are the pockets of the elderly you know? How about those of your parents, your aunts or uncles, or your neighbors?

What if you are the parents of a young couple? Or maybe you are a young couple trying to get started. Can they or you hope to own a home? Or are all of you struggling to survive?

If they are your children, can they afford $800 to $1,200 a month in house payments, on top of taxes and utility bills? Can they pay a $240 a month health insurance premium? Or $400 to $500 a month for car payments?

Do any of you have a secure job?

If you count only their cash in hand, there were 34 million people living in poverty a year ago, 34 million hungry adults and children.

How many more rich people are there today? How much richer are they? Why is the wealth of the country becoming concentrated in such a small group?

Look around you. How many small businesses are empty or boarded up? What happened to the corner grocery store? Or the Mom and Pop store where you used to buy small items? While you're at it: Ask who runs the big chain stores that put them out of business?

What happened to the humanitarian practice of medicine? Why is it now called the "health care industry" and operated at such a profit? Did you ever actually think the heart of America would grow so cold that we could accept the idea of rich people being allowed to make a profit off of sickness and human suffering?

I could go on raising these real questions that should be answered before you swallow the constant babbling of the "great communicator" about "special interests," or ["]big labor," or "Democrats are big spenders"—all presented in a way intended to conjure up a negative image in the minds of most people, to keep them from thinking about the actual questions facing all of us.

One of the most effective military tactics throughout the history of conflict has been the trick of creating a diversion to catch and hold the attention of the enemy, while you hold and attack at another weaker

point. For centuries, sleight-of-hand artists have used different versions of the old shell game to rip off millions of dollars.

Well, today, the rich, powerful flim-flam artists are ripping off everybody but themselves, padding their own pockets by getting us to focus on the wrong questions or issues. The current shell game is the American political process, and the barker is Ronald Reagan.

Isn't it time we all answered the questions I've posed above, and then asked two more questions:

In whose pocket is Ronald Reagan?

If the workers, the elderly, the poor, the young, and the minorities are special interest groups, and we are among them, and we have the next President of the United States in our pocket—what's wrong with that?

Any answer?

> K.T. Blaylock
> National President

## APPENDIX F

**Editorial**

**America is our special interest**

By Kenneth T. Blaylock,

National President

It is time we had a President who represents the right "special interest group."

All Presidents, Congressmen, and Senators represent special interest groups. Ronald Reagan, for example, represents the special interests of the rich, the Radical Right–Wing, and the international corporate power brokers of the world.

Yes, we are part of a special interest coalition! Our coalition is made up of workers, organized and unorganized, because we want and need jobs. Our coalition contains large numbers of poor people because they need jobs, housing, food, medical care, and education opportunities. A big part of our coalition is elderly. They need and are entitled to security, medical care, housing, and dignity!

We proudly accept millions of women who are entitled to parity with the male workforce as well as having special needs such as child care, job training, career opportunities, dignity and jobs.

Our coalition contains the minorities, Black, Brown, Red, Yellow, and White of all religious faiths who are entitled to the opportunity and dignity that our Constitution guarantees all men and women.

It is much better to have a President who represents the interests of the old, the young, the poor, the workers, the minorities, the handicapped, and unfortunate than to have a President who represents the interests of the rich and powerful who consider the rest of humanity a "resource" to use in building their personal fortunes and power.

I—along with all my brothers and sisters—am not a machine to be used as someone's resource. I am a human being created in the same manner as all other men and women—with the same right to dignity and opportunity.

Give me a President who will represent that special interest! Our numbers are larger than those who would oppose our political efforts. Our words are louder than theirs. Our votes will elect a President who's [sic] special interest is all Americans.

## APPENDIX G

**Opinion**

**Is this your idea of 'good government'?**

Time and again, here in this column, and before public meetings, and in my contacts with the media, I have contended as bluntly as I can that AFGE is opposing the Reagan Administration politically because this union is fighting as much to keep our government efficient and effective as it is to defend our members' jobs and dignity.

I have said repeatedly that what the Reagan Administration has done—under the pretense of improving our government—is to cut pay and chop benefits to make civil service so unattractive that the better minds and more talented technicians are

abandoning the federal workforce in droves.

It is a cold hard fact served up in indisputable figures by the impartial auditors of the Government Accounting Office in a new report released this past month.

Starting pay for government engineers is now less than half what they can earn in the private sector.

Both the Department of Defense and the National Aeronautics and Space Administration are having trouble (1) recruiting new technicians and (2) retaining longtime employees.

The Navy is facing shipyard problems because of the turnover in its physical scientists.

The National Cancer Institute has had to stop treating some patients it has helped in the past because it doesn't have enough technicians to run the equipment required.

There is, however, an even uglier truth to be faced than the fact, bad as it is, that Reagan Administration personnel policies under OPM Director Donald Devine are draining away the great reservoir of ability and talent that have made our government the best on earth.

Worse even than that is the disastrous situation that those who do remain out of loyalty and a sense of commitment are being badgered and browbeaten and maligned by the political hacks and bagmen Reagan has appointed to head the agencies.

Look, if you have the stomach for it, at what the likes of Anne Gorsuch and Rita Lavelle did to the reputation and effectiveness of the Environmental Protection Agency.

Recall if you can without blushing the embarrassment caused by the bigotry and insensitivity of James Watt when he was turned loose in the Interior Department.

Ask yourself why it is necessary to have a Special Prosecutor look into the financial affairs of Ed Meese, Reagan's nominee for Attorney General?

Wasn't John Mitchell's behavior enough to soil the good name of the Justice Department? Must we suffer that indignity again?

We are told by Reagan's press agents and his henchmen like Devine and David Stockman of OMB that what they're trying to do is transplant into government the attitudes and efficiencies of "private enterprise."

I ask you: Would the directors and stockholders of a profitable corporation turn its affairs over to a set of executives who (1) do not agree with company policy, (2) do not intend to carry out its programs, (3) belittle and besmirch the product, and (4) drive off the best and brightest managers and employees?

I don't think General Motors, or ITT, or IBM are run that way.

If the public ever is to understand what is being done to cripple and emasculate and eventually destroy what the government offers its citizens, it is apparently AFGE that must stand up and speak the truth.

Reagan knows that the public has, by and large, swallowed the lie that government is the enemy. Clever politician that he is, Reagan—with the help of his attendants—has exploited that falsehood to slander government employees. It's time he was challenged. I'm ready to take him on. Are you?

If you will speak up in your communities, then together we can overcome Reagan and his spoilers.

K.T. Blaylock
National President

## APPENDIX H

**Opinion**

**If this isn't 'politics,' I ask you what is?**

Ronald Reagan never to my knowledge played villains or won an Oscar when he was in pictures, but now that he's in politics he's my Bonzo Award nominee for his portrayal of a President heading an administration infamous for its double standard.

I propose his name because there surfaced a few days ago an OPM memo on pay equity legislation that is about the ultimate in political sleaze.

Which I grant you is going some for an administration that has already given us such shady statesmen as CIA Director William J. Casey, receiver of stolen Carter debate papers.

Or the departed superintendent of toxic waste non-disposal and convicted perjurer Rita Lavelle.

Or the would-be Attorney General who gives high public posts to those who make him non-interest loans, Mr. Edwin Meese III.

Or the bigoted peddler of valuable federal lands and minerals, former Secretary of the Interior James Watt.

The new hallmark of Reaganism, the memo by OPM's deputy associate director for staffing, James L. Byrnes, regarding the pay equity legislation, follows right in line for an administration that has turned its back on women's rights, reversed the trend on ending discrimination against minorities, slashed at Social Security benefits for the elderly, taken food stamps from the poor and school lunches from children, put millions more out of work and wants to cut the already minimum wage of summer-work teen-agers.

Mr. Byrnes's memo reminds the Reagan Administration Civil Service honchos that the "political possibilities" of the federal pay equity bill sponsored by Rep. Mary Rose Oakar "should not be underestimated."

"Rather than allowing Oakar to manipulate the Administration on the gender issue, we could create disorder within the Democratic House pitting union against union and both against radical feminist groups" which are, in Mr. Byrnes's words, a "constituency of the left."

"By doing job evaluations across clerical and blue collar occupations," clever Mr. Byrnes says, "a comparable worth study would immediately divide the white collar and blue collar unions."

This blatant politicizing of a basic male-female pay equity issue leaves a bitter taste in the mouth since it is ladled out by an administration whose Office of Special Counsel to the Merit Systems Protection Board doesn't have enough staff to adjudicate government employee appeals in disputes, but does have enough time to take political candidate buttons off federal workers and chant the restrictions of the Hatch Act to them.

Harassing, humiliating and demoralizing government workers with budget cuts and RIFs has been one Reagan tactic. Breaking a federal workers' union, PATCO, and jailing its leaders is a second. Now comes a third Reaganite anti-labor maneuver, trying to pit one union against another on the issue of equal pay for comparable worth.

If this Byrnes's shenanigan isn't politicizing an issue among federal workers, I don't know what is. Surely, Special Counsel K. William O'Connor can sense that, too, if he isn't too busy zeroing in on Mondale buttons and leafing through the Hatch Act for citations against government employees.

In light of Byrnes's scheme and O'Connor's one-sightedness, I ask you: What recourse do we have to salvage government programs, maintain operational efficiency and uphold the integrity of the Civil Service?

The only possible answer, of course, is to go into politics ourselves and help elect an administration that will restore the good name of government.

That's why I say again and again and again, vote yourself and help get others out to vote. The voting booth is our only hope and the only uncorrupt place left in the Reagan Administration.

K.T. Blaylock
National President